**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Docket No.   1:16CR10165-MLW-6 |
| DENNIS PLEITES RAMOS | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Dennis Pleites Ramos ("Mr. Ramos"), by and through undersigned counsel, respectfully submits this memorandum in conjunction with his sentencing scheduled for May 18, 2018.  Mr. Ramos requests this Honorable Court sentence him to twelve (12) months and one (1) day imprisonment, followed by three (3) years of supervised release, in light of the substantial substance abuse issues with which he struggled contemporaneously with, and leading up to, his offense conduct and his genuine new-found determination to overcome those issues.  In short, Mr. Ramos asserts the recommended sentence is "sufficient, but not greater than necessary" to achieve the purposes of the Sentencing Reform Act.

## PROCEDURAL HISTORY

On June 8, 2016, a nine (9) count indictment charging eleven (11) individuals with various firearms and cocaine base distribution related offenses was returned.  Mr. Ramos, the sixth named defendant, was charged only in count one (1) which alleged conspiracy to engage in the business of dealing in firearms, in violation of 18 USC §§ 371, 922(a)(1)(A). He was arrested the following day.

Mr. Ramos was released from detention on July 1, 2016 on conditions which included,

*inter alia*, no unlawful use or possession of a controlled substance, random drug screening, and participation in an inpatient or outpatient substance abuse program as directed by U.S. Pretrial Services. On January 25, 2017, he appeared before the Court (Kelly, M.J.) for a show cause hearing regarding violations of his conditions of release which alleged positive urine tests for opiates and/or marijuana and for failing to attend an intensive outpatient treatment program at Lahey Behavioral Health. He admitted in open court to abusing Percocet, was violated, and ordered to participate in inpatient treatment at Spectrum House. On February 14, 2017, Mr. Ramos left the program without authorization and was terminated from it as a participant, which resulted in his arrest on March 3, 2017.[1] He was held at the Plymouth County House of Corrections ("PCHC") until March 28, 2017 when he was released from PCHC and enrolled in a six (6) month in-patient residential substance abuse program at Gavin House. He successfully completed the program on September 28, 2017 and was released to after-care.

On October 5, 2017, Mr. Ramos pled guilty to count one (1) of the indictment. At that time, the parties tendered a plea agreement pursuant to Fed. R. Crim. P. 11(c)(1)(B) in which the parties agreed to the mathematical calculation of the guidelines but not as to actual sentence. Immediately after he tendered his guilty plea, this Honorable Court granted Mr. Ramos' petition for placement in the RISE Program, in which he began participating in on November 1, 2017. However, on November 21, 2017, Mr. Ramos was arrested for not complying with the program's requirements by virtue of testing positive for opioid use, missing a regular meeting, and returning to Chelsea in violation of his continued conditions of release. He was terminated from RISE and has been detained at PCHC from the time of his arrest on November 21, 2017 through the present.

---

[1] While continuing to acknowledge his addiction, Mr. Ramos advised the Court that Spectrum programming was not effective and that drugs were prevalent in the residential program.

# ARGUMENT

**I.    Applicable Law**

Under *United States v. Booker*, 543 U.S. 220, 259 (2005), the sentencing guidelines are no longer mandatory.  The Sentencing Reform Act requires the Court to consider guidelines ranges, *see* 18 USC § 3553(a)(4), but permits it to tailor the sentence in light of other statutory concerns.  These concerns include reflecting the seriousness of the offense, promoting respect for the law, providing just punishment, affording adequate deterrence, protecting the public, and effectively providing the defendant with needed educational or vocational training and medical care.  18 USC § 3553(a).  Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense; the history and characteristics of the defendant; the kinds of sentences available; the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.  *Id.*[2]

The sentencing court must compute the guidelines, which are the "starting point and the initial benchmark," but which may not be presumed reasonable.  *Gall v. United States*, 552 U.S. 38, 49-51 (2007).  Then, the court considers the parties' arguments, after which it makes an "individualized assessment based on the facts presented," considering all of the factors under 18 USC § 3553(a).  *Id*.  Ultimately, the sentencing judge must select a sentence within the statutory

---

[2]  Under *Booker,* this Court may consider certain factors that are rejected or ignored by the guidelines.  Sentencing courts previously were forbidden from considering, *inter alia*, a defendant's history and characteristics to the extent that they involved his mental and emotional condition, USSG § 5H1.3; her education and vocational skills, *id.* at § 5H1.2; drug or alcohol dependence, *id.* at § 5H1.2; socioeconomic status, *id.* at § 5H1.10; or lack of guidance as a youth, *id.* at § 5H1.12.  These factors can now support a sentence outside the guidelines.

range that is "sufficient, but not greater than necessary" to satisfy the varied purposes of punishment identified by Congress. 18 USC § 3553(a); *see also* 18 USC § 3553(a)(1)-(2).

The First Circuit has summarized the central principles of the post-*Booker* and -*Gall* sentencing procedure described above:

> This sequencing necessitates a case-by-case approach, the hallmark of which is flexibility. In the last analysis, a sentencing court should not consider itself constrained by the guidelines to the extent that there are sound, case-specific reasons for deviating from them. Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale. Rather, the court "should consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

*United States v. Martin,* 520 F.3d 87, 91 (1st Cir. 2008) (quoting *Gall*, 552 U.S. at 52).

## II.   Advisory Guidelines Calculation and Applicable Departures

The parties and U.S. Probation are in agreement as to the appropriate calculation of the Guidelines Sentencing Range ("GSR"). *See* Plea Agreement at 2; PSR ¶¶ 77-86. Specifically, because Mr. Ramos was a prohibited person[3] at the time he committed the instant offense, his base offense level is 14. *See* USSG § 2K2.1(a)(6). A 2-level increase applies because the firearm sold on October 16, 2015 had been reported stolen. *See* USSG § 2K2.1(b)(4)(A). An additional 4-level increase applies because Mr. Ramos engaged in the trafficking of firearms.[4] *See* USSG § 2K2.1(b)(5). Mr. Ramos, by virtue of his guilty plea, has clearly demonstrated acceptance of responsibility and he timely notified the government of his intent to plead guilty, resulting in a 3-

---

[3] "Prohibited person" is defined as, *inter alia*, "any person… who is an unlawful user of… any controlled substance." *See* 18 USC § 842(i)(3).

[4] As set forth in greater detail below, although Mr. Ramos has not objected to the imposition of this 4-level increase as a matter of technical guidelines calculation, he respectfully submits its effect on the guidelines (i.e. by doubling the low-end of the GSR) substantially overinflates his own culpability.

level reduction to his offense lever. *See* USSG §§ 3E1.1(a), (b). As a result, Mr. Ramos' total offense level ("TOL") is 17. Mr. Ramos has no prior convictions and thus falls into Criminal History Category I. In sum, Mr. Ramos' GSR is 24-30 months imprisonment.

**III.    The Requested Sentence Is Sufficient, But Not Greater Than Necessary, To Comply With The Statutory Purposes Set Forth In Under the Sentencing Reform Act.**

After determining the guideline range, this Court must consider whether the statutory factors warrant an ultimate sentence above or below the guideline range. *United States v. Jiménez-Beltre,* 440 F.3d 514, 518-19 (1st Cir. 2006). The Supreme Court has emphasized that section 3553(a) is "more than a laundry list of discrete sentencing factors; rather, it is a tapestry of factors, through which runs the thread of an overarching principle." *United States v. Rodríguez*, 527 F.3d 221, 228 (1st Cir. 2008) (citing *Kimbrough,* 552 U.S. at 101). That tenet – the "parsimony principle" – instructs "district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Id.* (quoting 18 U.S.C. § 3553(a)).

For the following reasons, and in light of the considerations set forth under section 3553(a), Mr. Ramos requests this Court sentence him to twelve (12) months and one (1) day imprisonment followed by three (3) years of supervised release coupled with any special conditions thereof this Court and U.S. Probation deem appropriate.

   A. **Background and Characteristics**

Mr. Ramos, a young man of 23 years, comes before this Court with an unfortunately now all-too familiar story of opioid addiction. Although he was raised by loving and hardworking parents who continue to stand by their son despite difficulties raising him, Mr. Ramos struggled as a youth. He began smoking marijuana at an exceedingly young age, thirteen (13), thereby

inhibiting a mind at one of its most crucial periods of development.[5]  His mother, in an effort to put a stop to this new behavior, successfully sought to have Mr. Ramos designated by the Commonwealth as a Child in Need of Services (CHINS).  As a result, Mr. Ramos, spent a portion of his early adolescence residing in a group home with other troubled youths and, because he was failing all but one of his 9th grade classes at Chelsea High School, was also enrolled into a non-traditional vocational training program through Youth Build where he learned a trade, became OSHA and Pre-Apprenticeship certified, and obtained his GED.  Although he completed this program, he did so with access to the same group of friends/contacts he had before and easily fell back into the same habit of marijuana use.  By the age of seventeen (17) he was smoking it on a daily basis, making habitual drug use as normal as any other daily activity. Without treatment, guidance or intervention, the scene was no doubt set for the dangerous addiction to Percocet he developed as a young adult.

One fateful day when he was nineteen (19) years old, he was confronted by a masked assailant who attempted to steal the cell phone Mr. Ramos was using.  As Mr. Ramos turned his back to flee, he was stabbed with such force that his spinal cord was punctured.  Carried home by adrenaline, his mother rushed him to the hospital where he recovered for a number of days.  When he left, he was prescribed 5 mg doses of Percocet.  But as so often happens, his lawful use of it as

---

[5] Two (2) longitudinal studies (one tracking individuals over a 25-year period, the other over a 38-year period) support the conclusion that persistent marijuana use during adolescence can significantly and permanently impair certain parts of cognition in adulthood. *See* Auer R, Vittinghoff E, Yaffe K, et al. *Association between lifetime marijuana use and cognitive function in middle age: the Coronary Artery Risk Development in Young Adults (CARDIA) Study*. JAMA Intern Med. February 2016 (finding a measurable decrease in verbal memory); Meier MH, Caspi A, Ambler A, et al. Persistent cannabis users show neuropsychological decline from childhood to midlife. Proc. Natl. Acad. Sci. 2012 (suggesting a causal relationship between heavy marijuana use during adolescence and relative lower IQ scores).

6

a doctor prescribed pain reliever quickly turned to illegal use to satisfy a body which believed it needed the drug just as much as water or food. It began shortly after his prescription ran out when a "friend," who noticed Mr. Ramos still hobbled with pain (which he continues to experience to this day, but only in the morning), offered him a 30 mg Percocet. He was hooked immediately and he began taking a pill each day. With a ready source who sold him the pills at a price much lower than its typical street value, he developed a full-blown opioid addiction rapidly. Within five (5) months of taking his first 30 mg tablet, he began fueling this false necessity by insufflating multiple pills a day. He did so day-in, day-out up until the time of his arrest for approximately a year and a half. Once he was hooked, he struggled to find and maintain employment, instead becoming more enmeshed in the negative street influences and gang culture so prevalent in his community (Chelsea). Although he eschewed gang-membership, himself, it is not surprising that a young, small in stature, multi-cultural adolescent, who was now addicted to an illicit drug, associated with people in whom he found a misguided sense of protection, belonging, community and brotherhood.

    This story of a young man being lost to the streets after being overwhelmed by addiction is sadly no longer a remarkable one. However, what is remarkable and unique to Mr. Ramos is that between the age of eighteen (18) and twenty-two (22), when he was arrested for the instant offense, he not only had no record of any crimes of violence, drug sales, or theft of property, but not a single adult conviction (or admission to facts sufficient regarding alleged criminal activity), perhaps bespeaking of an inner morality and strength or sense of propriety that underscores the personal tragedy of his own addiction.

    Moreover, Mr. Ramos has much to be hopeful for, to be inspired by, and to motivate him to once and for all move beyond his present circumstances, most notably the two (2) young sons

he is anxious to return to. His son Damien, now eight (8) months old, was born while Mr. Ramos was participating in court-ordered in-patient treatment at Gavin House. However, Damien remained at the hospital where he was born because his doctors discerned something wrong with him they were unable to diagnose until they performed exploratory surgery on his abdomen nearly a month later. The surgery revealed an intestinal infection which they successfully remedied with additional surgery. However, Damien required a substantial period of post-operative recovery in the Intensive Care Unit which coincided with Mr. Ramos' completion of the program at Gavin House. Mr. Ramos, his new-found sobriety untested, returned home in the difficult circumstance of waiting, powerless, to see if his new born son (who would not be allowed home from the hospital until late October) would make a full recovery.[6] He broke under the strain caused by the stress and concern for his son's precarious medical situation and relapsed after approximately seven (7) months of full sobriety (a feat in its own right given that it was his lengthiest continuous period of sobriety in over four (4) years).

It is respectfully submitted the circumstances which gave rise to his relapse evidence the need for at-home stability rather than an unwillingness or lack of commitment to sobriety on his part. He expresses a continuing goal and commitment to pursue life in recovery and has the means and wherewithal to succeed. First, he will not, under any circumstances, resume contact with any of the persons who so negatively influenced his life in the past and will be further insulated from them by living with his parents in their new home in Lawrence. Second, and most importantly, he plans to remain as busy and productive as possible which he has come to learn is crucial to maintaining his sobriety. His father, who owns a construction company, has ready employment

---

[6] His son and mother were living in Chelsea in November, 2017. Mr. Ramos went to Chelsea in violation of his conditions of release in order to be with them at this critical time.

for Mr. Ramos; with the rest of his time, he intends spend it by raising his new born son and resuming the arrangement he had for visitation and custody of his now three (3) year old son with another woman. Ebony, the mother of his infant son, has no criminal history or substance abuse issues of her own and appears to be a suitable person to help him remain on the straight and narrow while they raise their son together.[7]

### B. Offense Conduct

The sum of Mr. Ramos' offense conduct is set forth in paragraphs 60 and 61 of the PSR which describe unlawful firearm sales transactions occurring on October 6 and 16, 2015. With respect to the October 6 transaction, Mr. Ramos' co-conspirator, Omar Villegas, agreed to sell a firearm to the cooperating witness ("CW") for $1,500. The transaction occurred in the CW's vehicle; Villegas was observed leaving from, and subsequently returning to, the same address which he shared with Mr. Ramos and others immediately before and after the transaction occurred. As for the October 16 transaction, Villegas agreed to sell two (2) firearms to the CW for $2,500. Villegas brought one firearm, and Mr. Ramos brought the other (which was determined by authorities to have been reported stolen).

### C. A Below Guidelines Sentence Is Appropriate In This Case

The guidelines ought not be used as a benchmark for Mr. Ramos' sentence because: (1) the Mr. Ramos' offense conduct technically triggers the four (4) level increase for trafficking in firearms which causes the low-end of his GSR to double and has the effect of substantially overstating his own culpability for the core conduct at issue; and (2) the guidelines fail to

---

[7] Under the conditions of release which were in place at the time after he completed the program at Gavin House, he was not authorized to go to Chelsea where Ebony resides. He respectfully asks this same condition not be made part of his terms of supervised release so he may have easier access to his child. It is respectfully submitted allowing him the best possible means to parenthood will help enforce and secure his sobriety.

adequately assess whether and to what extent additional incarceration will have diminishing returns to further the aims of sentencing for this particular defendant.

As noted above, Mr. Ramos' offense conduct relates to two (2) firearms sale transactions. With respect to the October 6 transaction, Mr. Ramos is entirely absent from it altogether. The only factual circumstance which ties him to it is that he and Villegas, who lived with Mr. Ramos' sister in the same apartment where Ramos' resided with his family, share the same residential address, outside of which the CW met Villegas when the transaction was conducted. There is nothing which suggests Mr. Ramos was aware of this particular transaction, let alone that he negotiated it in any way, shared in the proceeds, or procured the firearm for sale. Although Mr. Ramos has not objected to the PSR regarding this transaction because its inclusion/exclusion has no effect on the guidelines, its bearing on his own culpability for the offense of conviction is *de minimis* at best.

The lion's share of Mr. Ramos' culpability, therefore, lies in his conduct with respect to the October 16 transaction. However, as to that, Mr. Ramos, again, did not negotiate the sale of the firearm and there is no evidence to establish he was personally aware it had been reported stolen or used in an MS-13 shooting.[8] However, he has accepted responsibility for his offense of conviction, a conspiracy, and therefore bears the moral responsibility, not just for the sale of the firearm he brought to the transaction, but for the one brought by Villegas he knew was part of the joint sale. USSG § 2K2.1(b)(5)'s 4-level increase is triggered if a minimal threshold of at least two (2) firearms were transferred; because he is responsible for both firearms in this transaction, the enhancement applies. However, once triggered, the analysis stops and the low-end of Mr.

---

[8] Mr. Ramos recognizes that the 2-level enhancement for trafficking in a firearm which has been reported stolen does not require knowledge on his part that it was stolen to trigger application of the enhancement.

Ramos' GSR is increased by 100% (specifically, from what would otherwise be a TOL 13 and corresponding GSR of 12-18 months, to a TOL 17 and a corresponding GSR of 24-30 months).

Reliance on the guideline's assignment of culpability through counting firearms, at least in this context, not only deprives Mr. Ramos of individualized sentencing, but introduces a great deal of arbitrariness to the analysis. Consider, for example, if Villegas decided not to sell his firearm and only the one Mr. Ramos brought was sold. One firearm does not trigger the enhancement and Mr. Ramos would instead be looking at a low-end GSR of 12 months. To what extent, then, is Mr. Ramos' own, personal moral culpability changed by Villegas' also having brought a firearm for sale and/or for Villegas having negotiated the sale of both? According to the guidelines, his culpability is doubled. But consider if Mr. Ramos had, instead, brought two (2), bringing the number of firearms sold to three (3), he would be subject to an additional 2-level enhancement, *see* USSG § 2K2.1(b)(1)(A), bringing his TOL to 19 and raising the low-end of the GSR from 24 to 30 months. Or what if instead of two (2) firearms, he hypothetically brought four (4), for a total of five (5) firearms sold that day; in those circumstances his GSR would be no different than in the hypothetical where he brings two (2). One firearm sets the initial bar, two (2) firearms doubles it, three (3) firearms raises it by a quarter, but five (5) doesn't change a thing. Take a different hypothetical defendant who, like Mr. Ramos, is responsible for trafficking in two (2) firearms, but instead of conducting both in a single sale, he sells them to different people on different days. Under the guidelines, this hypothetical defendant is equally as culpable as Mr. Ramos, and yet they can be readily distinguished: the former consciously engages in unlawful conduct only once whereas the latter chooses the same course of conduct multiple times. And yet the 4-level enhancement applies to both and the guidelines treat each on a parity. This all suggests the guidelines, helpful in other contexts, offers nothing but arbitrariness in this one. Mr. Ramos

respectfully submits it ought to play little to no role when fashioning a sentence which factors his own culpability for the criminal conduct he engaged in.

But even assuming Mr. Ramos' GSR was properly calibrated for purposes of his culpability, punishment for misdeeds is among many other sentencing considerations, not the exclusive one. As set forth above, Mr. Ramos struggled mightily with an opioid addiction; his addiction's temporal juxtaposition with the instant offense conduct suggests a degree of causality especially given that his misbehavior did not turn criminal until he was exposed to opiates. It is both conceded and undisputed that causation partly attributable to an addiction he brought on himself does not negate criminal responsibility, and Mr. Ramos is prepared now to take his share of it. However, it is respectfully submitted the best way he can do so is by purging himself of what appears to be the behavior which so greatly contributed to his criminal conduct. As of the date of sentencing, Mr. Ramos who prior to being charged in the instant indictment had never spent so much as one day in an actual county jail or correctional facility, will have served a disproportionately long period in comparison to his young life as the distinct result of a brief relapse after his longest period of continuous sobriety since the time of his back injury some four (4) years ago. If imposed, the sentence recommended herein will force continued sobriety for a period equal to what he accomplished prior to the relapse and which very well could have been maintained but for the difficult circumstances surrounding his infant son upon his release from Gavin House. It is true that Mr. Ramos was afforded multiple opportunities during pre-trial release to remain sober which he ultimately failed to do. However, that is the true nature and curse of addiction. Because each relapse instance he experienced while on pre-trial release was preceded by a relatively short period of either in- or out-patient treatment, it is clear the protocols and parameters were insufficient for him to develop healthier habits and routines. From this, it can be

fairly said the instant period of incarceration, therefore, appears to have been brutally necessary to save Mr. Ramos from himself. Incarceration over and above the time necessary to establish healthier habits and routines will serve no other purpose than to punish an individual wanting only to forge ahead, remain sober, be a father, and to contribute meaningfully.

Mr. Ramos is now acutely aware that he has run out of second chances and what will happen if, during his period of supervised release, he fails to live up to all of what is expected of him. His missteps while on pretrial release all promptly resulted in his arrest and forcefully taught him there is no hiding from his mistakes while under U.S. Probation's watchful eye. Therefore, in the event the proposed recommendation of twelve (12) months and a day is imposed, Mr. Ramos would readily accept it with a full appreciation of how truly great an opportunity he is being given, the kinds of obligations which come with that opportunity, and how great the punishment would be for failing to meet each and every one imposed by this Court. He therefore respectfully asks this Court to afford him an opportunity to prove both himself and that he truly has learned important lessons in the process. By ensuring Mr. Ramos maintains sobriety for a healthy and sufficient period of time, the proposed recommendation "is no greater than necessary" to achieve the aims of the Sentencing Reform Act.

## CONCLUSION

Based on the foregoing, Mr. Ramos respectfully requests this Honorable Court sentence Mr. Ramos to twelve (12) months and a day, with a judicial recommendation for RDAP enrollment, even if truncated by the requested sentence, followed by three (3) years of supervised release.

Date:   May 14, 2018                    Respectfully submitted,
                                        DENNIS PLEITES RAMOS
                                        By and through his attorney,

                                         /s/ *R. Bradford Bailey*
                                        R. Bradford Bailey, BBO#549749
                                        BRAD BAILEY LAW, P.C.
                                        44 School St., Suite 1000
                                        Boston, Massachusetts 02108
                                        Tel.:   (857) 991-1945
                                        Fax:    (857) 265-3184
                                        brad@bradbaileylaw.com


Certificate of Service

I, R. Bradford Bailey, hereby certify that on this, the 14th day of May, 2018, I caused a true copy of the foregoing *Defendant's Memorandum in Aid of Sentencing* to be served upon all necessary parties by virtue of electronically filing the same via the court's CM/ECF system.

                                        /s/ *R. Bradford Bailey*
                                        R. Bradford Bailey